IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | |
|---|---|
| BRIAN JERMAINE DODSON, #308329, )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>CHERRY LINDAMOOD, et al., )<br>    Defendants. ) | Case No. 1:18-cv-00058<br>Judge Campbell / Frensley |

## **REPORT AND RECOMMENDATION**

### **I. INTRODUCTION AND BACKGROUND**

This matter is before the Court upon two Motions to Dismiss: the first, filed by Defendant Ronald Higgs, M.D. (Docket No. 26); and the second, filed by Defendant Edmund Lane, M.D. (Docket No. 28). Both Motions are accompanied by supporting Memoranda of Law. Docket Nos. 27, 29.

Plaintiff has not responded to either Motion.

Plaintiff, an inmate housed at South Central Correctional Facility ("SCCF"), who was previously housed at Morgan County Correctional Facility ("MCCX"), filed his pro se, in forma pauperis Complaint in this action on August 7, 2018, alleging that Defendants have violated his Eighth and Fourteenth amendment rights pursuant to 42 U.S.C. § 1983. Docket No. 1. Plaintiff avers that Defendants have denied him "all necessary and appropriate medical care that he has needed and repeatedly requested for ongoing, severe, excruciating headaches that he has had for months and years, for vision problems which include such things as seeing black and/or fuzzy spots in his field of vision, and other physical ailments including severe pain throughout his body, including severe pain in his extremities, including his feet, which are going numb." *Id.*

Plaintiff's Complaint does not state the capacity in which he sues Defendants, but he seeks declarative and injunctive relief. *Id.* Specifically, Plaintiff seeks a declaration that "Defendants have violated Plaintiff's right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments, and that Defendants have been, and continue to be deliberately indifferent to his serious medical needs"; an Order requiring Defendants to provide Plaintiff with "all necessary and appropriate diagnostic and treatment modalities to stop his ongoing and excruciating pain, including the full neurological workup and treatment ordered by Dr. Wiley in 2017"; the appointment of counsel and permission to proceed in forma pauperis; and "any and all relief which is just and fair and proper under the circumstances, including any and all appropriate damages." *Id.*

Defendant Higgs filed his Motion to Dismiss and supporting Memorandum of Law arguing that Plaintiff's claims against him should be dismissed for failure to state a claim upon which relief may be granted and failure to exhaust his administrative remedies. Docket Nos. 26, 27. Specifically, Defendant Higgs argues that Plaintiff's attachments to his Complaint show that he received medical care; accordingly, his deliberate indifferent claims are incorrectly based on alleged inadequate medical treatment, instead of the required lack of medical treatment. *Id.* Defendant Higgs asserts that inadequate medical treatment claims are not viable under 42 U.S.C. §1983 (*id, citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), and that Plaintiff's claims are instead subject to the Tennessee Health Care Liability Act codified at TCA § 29-26-101, et. seq. Defendant Higgs maintains that Plaintiff has failed to abide by the Notice and Certificate of Good Faith required thereunder (*id., citing* TCA § 29-26-121, 122).

Additionally, Defendant Higgs argues that Plaintiff has failed to exhaust his administrative remedies with regard to Plaintiff's claims against him, because Plaintiff filed this

2

action without first filing a grievance specific to Defendant Higgs as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a). *Id*. Defendant Higgs also requests an award of attorney's fees. *Id.*

Defendant Lane filed his Motion to Dismiss and supporting Memorandum of Law arguing that Plaintiff's claims against him should be dismissed for failure to state a claim upon which relief may be granted. Docket Nos. 28, 29. Specifically, Defendant Lane argues that Plaintiff's attachments to his Complaint show that he received medical care; accordingly, his deliberate indifferent claims are incorrectly based on alleged inadequate medical treatment, instead of the required lack of medical treatment. *Id.* Defendant Lane asserts that inadequate medical treatment claims are not viable under 42 U.S.C. §1983 (*Id, citing Estelle v. Gamble*, 429 U.S. 97, 104 (1976)), and that Plaintiff's claims are instead subject to the Tennessee Health Care Liability Act codified at TCA § 29-26-101, et. seq. Defendant Lane maintains that Plaintiff has failed to abide by the Notice and Certificate of Good Faith required thereunder. *Id., citing* TCA § 29-26-121, 122.

As has been noted, Plaintiff has not responded to either Motion.

For the reasons set forth below, the undersigned recommends that Defendant Higgs' Motion to Dismiss (Docket No. 26) be GRANTED. The undersigned further recommends that Defendant Lane's Motion to Dismiss (Docket No. 28) likewise be GRANTED.[1] With regard to Defendants Higgs and Lane's request for attorneys' fees, the undersigned recommends that said request is DENIED.

---

[1] Because the instant Motions to Dismiss are brought only by Defendants Higgs and Lane, the undersigned will limit discussion of the facts and issues herein to those that are relevant to Plaintiff's claims against Defendants Higgs and Lane. The recommendations contained in this Report and Recommendation are likewise limited to Plaintiff's claims against Defendants Higgs and Lane; the undersigned expresses no opinion herein regarding the remainder of Plaintiff's claims against the other Defendants.

## II. FACTUAL ALLEGATIONS

### A. Factual Allegations in Plaintiff's Complaint Against Defendant Higgs

On August 8, 2017, Dr. Wiley advised TDOC medical personnel (including Edmund Lane and/or Ronald Higgs) that Plaintiff was suffering from "chronic severe headaches," and that he needed to receive "neurological and psychological intervention." Docket No. 1, ¶ 17, citing Ex.1. Dr. Wiley also indicated the need for said consult was "urgent." *Id.* "That was nearly a year ago, and Plaintiff has been denied required medical assistance for many months and years now." *Id.*, ¶ 18.

### B. Factual Allegations in Plaintiff's Complaint against Defendant Lane

On August 8, 2017, Dr. Wiley advised TDOC medical personnel (including Edmund Lane and/or Ronald Higgs) that Plaintiff was suffering from "chronic severe headaches," and that he needed to receive "neurological and psychological intervention." Docket No. 1, ¶ 17, citing Ex.1. Dr. Wiley also indicated the need for said consult was "urgent." *Id.* "That was nearly a year ago, and Plaintiff has been denied required medical assistance for many months and years now." *Id.*, ¶ 18.

### C. Factual Allegations Related to Plaintiff's Medical Care

Plaintiff was stabbed in the head and severely injured in August 2015 while incarcerated at Riverbend Maximum Security Institution. Docket No. 1., ¶ 11. For months and months, Plaintiff has been complaining to his attorney and to anyone at the prison that he can, that he suffers daily from severe headaches that he feels all throughout his head, and that he sees dark and/or fuzzy spots in his field of vision. *Id.*, ¶ 8. The pain is intense and ongoing and Plaintiff needs immediate relief from this suffering; he may have an aneurysm or brain tumor. *Id.*, ¶ 9. Plaintiff has not received medical treatment for these severe headaches despite ongoing requests

for treatment and similar requests made by counsel. *Id*.

On April 24, 2017, Plaintiff's federal habeas attorney sent an overnight letter to the MCCX Warden requesting immediate treatment. *Id.*, ¶ 12. Plaintiff's federal habeas attorney was informed that Plaintiff needed to sign up for sick call, and counsel informed Plaintiff to do so, which Plaintiff did, but nothing happened. *Id.*, ¶ 13. On May 31, 2017, Plaintiff's federal habeas attorney again implored the MCCX Warden to treat Plaintiff, but still nothing happened. *Id.*, ¶ 14.

During the summer of 2017, Plaintiff's habeas counsel spoke to Disability Rights Tennessee (a nonprofit organization) to try to get assistance for Plaintiff; one of their investigators visited Plaintiff in late July/early August 2017. *Id.*, ¶ 15. Disability Rights Tennessee thereafter spoke to Dr. William Wiley at the downtown TDOC office, and Dr. Wiley informed them that Plaintiff would be recommended to be sent to TDOC's Special Needs Facility (in Nashville) for treatment. *Id.*, ¶ 16. Afterwards, Plaintiff was informed by a nurse at MCCX that Plaintiff was to be sent to the Special Needs Facility in Nashville. *Id.*, ¶ 19.

In late August 2017, Plaintiff was put on a transport bus, with Plaintiff assuming that he was going to be taken to Special Needs, but when the bus got to the Special Needs Facility, Plaintiff was told he was not being dropped off at Special Needs and he was required to remain on the bus until he was transported to SCCF, where Plaintiff has remained since. *Id.*, ¶¶ 20-22.

Plaintiff has repeatedly and unsuccessfully tried to get medical treatment for his headaches, vision, and other problems while at SCCF. *Id.*, ¶ 23. Plaintiff spoke to the SCCF Warden, who "brushed him off" saying that it was up to medical, so Plaintiff spoke to the nurses. *Id.*, ¶ 24. Plaintiff had only received Excedrin, which does not stop the intense pain of the headaches. *Id.*

5

On October 2, 2017, Plaintiff spoke to his habeas attorney and informed him that Plaintiff had still not received medical attention. *Id.*, ¶ 25. Plaintiff "explained that it was just the same old thing. He was suffering (and was continuing to suffer) headaches, see spots in front of his eyes and shadows in the field of vision. Plaintiff explained to his habeas attorney that he was being tortured and desperately needed some relief. Plaintiff informed [his attorney] that it's every single day that he has been suffering headaches and vision problems and that he couldn't get any relief." *Id.*

The following day, on October 3, 2017, Plaintiff's habeas attorney sent an overnight letter to SCCF Warden Lindamood, asking her to provide Plaintiff treatment. *Id.*, ¶ 26. "Still nothing happened." *Id.* On or about October 13, 2017, Plaintiff spoke with SCCF Assistant Warden Bryant, but the Assistant Warden still had not gotten Plaintiff any treatment. *Id.*, ¶ 27. Plaintiff also spoke with a prison psychiatrist requesting additional medical treatment, but she told Plaintiff that she did not see anything wrong with him; Plaintiff asked her how she could assess physical problems within his head by just looking at him. *Id.*, ¶ 28. Plaintiff explained to his habeas attorney on October 13, 2017, that he was still dealing with excruciating headaches every day all over his head, still seeing black spots, and "can't get no medical attention." *Id.*, ¶¶ 29, 30.

Plaintiff also had a burn mark on his right foot and the back part of his left inner heel had been numb. *Id.*, ¶ 31.

On October 16, 2017, Plaintiff spoke to SCCF Warden Lindamood (who informed him that she had received the letter from Plaintiff's attorney) and SCCF Assistant Warden Bryant, and they told Plaintiff that medical treatment was up to medical; they refused to order treatment. *Id.*, ¶ 32. The same day, Plaintiff told his habeas attorney that he was constantly having

headaches and that he was not supposed to have headaches daily. *Id.*, ¶ 33.

On October 20, 2017, Plaintiff was continuing to have the same symptoms and need medical attention. *Id.*, ¶ 34. On October 26, 2017, Plaintiff still had not received medical attention; Plaintiff was having the same pain. *Id.*, ¶ 35.

On November 2, 2017, Plaintiff saw psychiatrist Ms. Steadman, who said she referred Plaintiff to a doctor, but Plaintiff still did not see a doctor. *Id.*, ¶ 36. On November 6, 2017, Plaintiff informed his habeas attorney that he was still having the headaches and seeing black spots. *Id.*, ¶ 37. Plaintiff spoke to the SCCF Warden, but still did not receive any medical treatment and signed up for sick call for a large lump on the left side of his head, "which still to this day has not been properly evaluated or treated." *Id.*

On November 8, 2017, Plaintiff spoke to a nurse, Ms. Robinson, who referred Plaintiff to an eye doctor and the regular doctor, and Plaintiff asked about pain medication, but she said she could only give it to Plaintiff for up to four days. *Id.*, ¶ 38. When Plaintiff went to get the pain medication at the medication window, they said none had been prescribed. *Id.*, ¶ 39. On November 9, 2017, Plaintiff's vision was still blurry, and he was still seeing black spots; he told his habeas attorney that the Warden "wouldn't do anything" and he was "up a creek without a paddle." *Id*.

On November 13, 2017, personnel gave Plaintiff pain medication, Excedrin, but Plaintiff felt only a "small amount of relief for maybe 5-10 minutes, but then the pain came back the same as ever"; the Excedrin was not helping. *Id.*, ¶ 40.

As of November 16, 2017, Plaintiff still had not seen a doctor. *Id.*, ¶ 41. The nurse told Plaintiff to sign up for sick call and told Plaintiff that he was on the list to see a doctor. *Id.*

By November 20, 2017, Plaintiff was taking Excedrin twice a day but still not getting any

relief. *Id.*, ¶ 42. Plaintiff was still in pain; nothing changed; he still had not seen a doctor. *Id.*

On November 21, 2017, Plaintiff told his habeas attorney that he was not doing well and was still having severe headaches. *Id.*, ¶ 43. Plaintiff told nurse Rich that there was something very wrong; nurse Rich told Plaintiff to sign up for sick call. *Id.* When Plaintiff signed up for sick call, he still has not been seen by a doctor for his pain and vision problems. *Id.*

When Plaintiff "has eaten prison food, within an hour or two, certain parts of his body start hurting real bad." *Id.*, ¶ 44.

On November 27, 2017, Plaintiff spoke to the SCCF Warden and told her that he was in need of immediate medical treatment and that he had done what he had been told to do, namely, sign up for sick call. *Id.*, ¶ 45. SCCF Warden told Plaintiff that she was "not medical"; Plaintiff told her that he was not supposed to have headaches every day. *Id.* On November 28, 2017, Plaintiff told his habeas attorney that the pain in his head was a 7 ½ or 8 on a scale of 10. *Id.*, ¶ 46.

On December 1, 2017, Plaintiff spoke with a nurse who said that she would try to get him seen by a doctor. *Id.*, ¶ 47. The pain in Plaintiff's head is unrelenting and will stop for maybe 10-15 minutes per day. *Id.*, ¶ 48.

By December 12, 2017, Plaintiff still had not seen a doctor. *Id.*, ¶ 49. Plaintiff again spoke to the SCCF Warden telling her of his pain; she looked at Plaintiff and rolled her eyes. *Id.*

On January 2, 2018, Plaintiff spoke to a mental health counselor because he was still having continuous pain. *Id.*, ¶ 50. Plaintiff was told by the mental health counselor: "There is nothing I can do about it." *Id.* Plaintiff tried again to sign up for sick call by the end of the week. *Id.*, ¶ 51. On January 8, 2018, Plaintiff requested sick call and a nurse practitioner said she would re-refer Plaintiff to an eye doctor; he said he needed to be seen by the "main doctor."

*Id.*

On January 10, 2018, Plaintiff still had not been seen by the doctor; nothing had changed; his head was still hurting. *Id.*, ¶ 52. On January 17, 2018, nothing had changed; Plaintiff was still having painful headaches all day long. *Id.*, ¶ 54.

Plaintiff filed a grievance setting forth this deliberate indifference to his serious medical needs. *Id.*, ¶ 56. Plaintiff's grievance was denied. *Id.*

On February 7, 2018, Plaintiff received x-rays and Tylenol, but still suffered ongoing headaches. *Id.*, ¶ 57.

Plaintiff saw an eye doctor in February 2018, who said Plaintiff's problems were not caused by his eyes. *Id.*, ¶ 58.

By March 6, 2018, Plaintiff still had not seen a medical doctor for treatment of his headaches and pain, and his headaches had not gotten better. *Id.*, ¶ 59.

On March 12, 2018 and March 19, 2018, Plaintiff still had severe headaches. *Id.*, ¶ 60. On March 22, 2018, Plaintiff informed his habeas counsel that his situation was not getting any better. *Id.*, ¶ 61.

By May 1, 2018, Plaintiff's pain was the same; nothing had changed and he had received no further treatment. *Id.*, ¶ 62.

"A new doctor, Bush, apparently took over as doctor at the South Central Correctional Facility as of early May, 2018, but Dr. Bush has not seen Plaintiff." *Id.*, ¶ 63.

On or around May 23, 2018, a dentist ruled out Plaintiff's pain as being caused by his teeth. *Id.*, ¶ 64.

On May 30, 2018, Plaintiff informed his habeas counsel that "I am in pain right now. I'm constantly in pain. I'm not supposed to be having headaches." *Id.*, ¶ 65. By June 2018, Plaintiff

had still not been seen by Dr. Bush. *Id.*, ¶ 66. By June 28, 2018, Plaintiff still endured the same pain he has been enduring for years; nothing has changed. *Id.*, ¶ 67.

### III. LAW AND ANALYSIS

#### A. Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 12(b)(6) provides that a claim may be dismissed for failure to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory. *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. *Id.* A complaint containing a statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient. *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). The "[f]actual allegations must be enough to raise a right to relief above the speculative level"; they must "state a claim to relief that is plausible on its face." *Id.* at 1965, 1974. *See also, Ass'n of Cleveland Fire Fighters v. City of Cleveland*, 502 F.3d 545, 548 (6th Cir. 2007).

Moreover, the United States Supreme Court has recently addressed the appropriate standard that must be applied in considering a Motion to Dismiss for failure to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The *Iqbal* Court stated in part as follows:

> Two working principles underlie our decision in *Twombly*. First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice . . . . Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss . . . .

> Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. . . . But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not "show[n]" - "that the pleader is entitled to relief."

556 U.S. at 678-79 (citations omitted).

### B. 42 U.S.C. § 1983

#### 1. Generally

Plaintiff alleges violations of his Eighth and Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983. Docket No. 1. Section 1983 provides, in part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

Thus, in order to state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988) (*citing Parratt v. Taylor,* 451 U.S. 527, 535 (1981) (overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330-331 (1986)); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155 (1978)). The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49, 108 S. Ct. 2255 (*quoting United States v. Classic,* 313 U.S. 299, 326 (1941)).

## 2. Eighth Amendment

### a. Generally

The Eighth Amendment provides that:

> Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.

U.S. Const. amend. VIII.

The United States Supreme Court has held that the constitutional prohibition of "cruel and unusual punishments" forbids punishments that are incompatible with "the evolving standards of decency that mark the progress of a maturing society," or which "involve the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (citations omitted).

In order to establish an Eighth Amendment claim, an inmate must satisfy a two-prong test: (1) the deprivation alleged must be objectively serious; and (2) the official responsible for the deprivation must have exhibited deliberate indifference to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

### b. Deliberate Indifference to Serious Medical Needs

The State has a constitutional obligation, under the Eighth Amendment, to provide adequate medical care to those whom it has incarcerated. *Estelle,* 429 U.S. at 104.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle,* 429 U.S. at 104. This is true "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id*. at 104-05.

Not every prisoner's allegation of inadequate medical treatment, however, is a violation of the Eighth Amendment. *Estelle,* 429 U.S. at 105. For instance, courts have held that the accidental, inadvertent, or negligent failure to provide adequate medical care does not state such a claim. *Id.* at 105-06 (citations omitted).

Pursuant to Supreme Court precedent, the Sixth Circuit held, in *Hunt v. Reynolds*, that Eighth Amendment deliberate indifference claims must contain both an objective component, "that [plaintiff's] medical needs were sufficiently serious," and a subjective component, "that the defendant state officials were deliberately indifferent to the plaintiff's needs." 974 F.2d 734, 735 (6th Cir. 1992) (citations omitted).

In order to satisfy the objective requirement, the Supreme Court requires that an inmate demonstrate evidence of a current harm or evidence of a medical complaint or condition of confinement that "is sure or very likely to cause serious illness and needless suffering." *Helling v. McKinney*, 509 U.S. 25, 33 (1993). Under the Eighth Amendment, inmate plaintiffs, must allege, at the very least, unnecessary pain or suffering resulting from prison officials' deliberate indifference. *Id*. (prisoner alleging that he suffered pain and mental anguish from delay in medical care states a valid Eighth Amendment claim).

As for the subjective element, the Sixth Circuit has held that "a determination of deliberate indifference does not require proof of intent to harm." *Weeks v. Chaboudy*, 984 F.2d 185, 187 (6th Cir. 1993). There must, however, be a showing of deliberate indifference to an inmate's serious medical needs. *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988) (*citing Westlake v. Lucas*, 537 F. 2d 857, 860 n. 3 (6th Cir. 1976)). In fact, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is

essential to a finding of deliberate indifference." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994) (citations omitted). The inquiry, therefore, according to the Sixth Circuit, is "[w]as this individual prison official aware of the risk to the inmate's health and deliberately indifferent to it?" *Thaddeus-X*, 175 F.3d at 402 (*citing Farmer v. Brennan*, 511 U.S. 825, 837, 844 (1994)).

### 4. Individual Capacity Claims

42 U.S.C. § 1983 does not permit the imposition of liability based upon *respondeat superior*. *Polk County v. Dodson*, 454 U.S. 312, 325, 102 S. Ct. 445, 454, 70 L. Ed. 2d 509 (1981). *See also, Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978); *Street v. Corrections Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996).

In order for a defendant to be held liable in his individual capacity, a plaintiff must demonstrate that that defendant personally condoned, encouraged, or participated in the conduct that allegedly violated his rights. *Birrell v. Brown*, 867 F.2d 956, 959 (6th Cir. 1989) (citations omitted). *See also, Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir. 1984) (*citing Hays v. Jefferson County,* 668 F. 2d 869, 872-874 (6th Cir. 1982) (The supervisor must have "at least implicitly authorized, approved or knowingly acquiesced in" the misconduct.) Conclusory allegations are not enough. *See Street,* 886 F.2d at 1479. *See also, Anderson,* 477 U.S. at 257; *Nix v. O'Malley,* 160 F.3d 343, 347 (6th Cir. 1998); *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990); *McDonald v. Union Camp Corp.,* 898 F.2d 1155, 1162 (6th Cir. 1990). Plaintiff must establish a "causal connection between the misconduct complained of and the official sued." *Dunn v. State of Tennessee*, 697 F.2d 121, 128 (6th Cir. 1982).

### 5. Official Capacity Claims

In complaints alleging federal civil rights violations under § 1983, "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents." *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000) (*citing Kentucky v. Graham*, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114 (1985)). *See also, Frost v. Hawkins County Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir. 1988). As such, when a public employee is sued in his or her official capacity, the claims are essentially made against the public entity. *Id*. Additionally, where an entity is named as a defendant, an official capacity claim against its individual employees is redundant, and those claims should be dismissed. *Foster v. Michigan*, 573 Fed. Appx. 377, 390 (6th Cir. 2014); *Faith Baptist Church v. Waterford Twp.*, 522 F. App'x 322, 327 (6th Cir. 2013).

### C. Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e

A prisoner must exhaust all available administrative remedies before filing a claim under §1983 or any other federal law. 42 U.S.C. §1997e(a). *See also, e.g., White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997); *Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir. 1998); *Wyatt v. Leonard*, 193 F.3d 876, 878 (6th Cir. 1999). The Prison Litigation Reform Act of 1995 provides in pertinent part as follows:

> (a) **Applicability of Administrative Remedies**. No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a) (emphasis original).

Additionally, the filing of an initial grievance is not sufficient to satisfy the requirements of

§ 1997e(a). Rather, the PLRA exhaustion of prison administrative remedies requires a prisoner to pursue his prison grievance through the final level of administrative appeal. *Hartsfield v. Vidor*, 199 F.3d 305, 306 (6th Cir. 1999). In *Hartsfield*, the Sixth Circuit explicitly stated:

> Even if Plaintiff did file an initial grievance against [defendants], he was required to continue to the next step in the grievance process . . . . We have previously held that an inmate cannot simply . . . abandon the process before the completion and claim that he has exhausted his remedies. . .

When a defendant shows that a plaintiff has not "exhausted all available state administrative remedies," the only remaining question is whether the plaintiff's claims have been brought with respect to "prison conditions" as that term is used in 42 U.S.C. § 1997e(a).

The Sixth Circuit discussed the meaning of the term "prison conditions" as used in 42 U.S.C. § 1997e(a) in *Freeman v. Francis*, 196 F.3d 641 (6th Cir. 1999). In *Freeman*, Plaintiff inmate brought a lawsuit against prison officials claiming that they had used excessive force against him. The lower court had dismissed his complaint for failure to exhaust administrative remedies. On appeal, the plaintiff argued in part that he was not required to exhaust his administrative remedies because his excessive force claim did not involve a "prison condition" within the meaning of § 1997e(a). The *Freeman* Court stated in part as follows:

> The phrase "action . . . with respect to prison conditions" is not defined in § 1997e. Because the question is one of statutory construction, we must first look to the plain language of the statute. Defendants argue that the term "prison conditions" as used in 18 U.S.C. § 3626(g)(2), which was amended as part of the same legislation as § 1997e, does include claims such as excessive force because it expressly includes "effects of actions of government officials on the lives of confined persons" as well as "conditions of confinement" in defining "prison conditions." . . . It is generally recognized that when Congress uses the same language in two different places in the same statute, the words are usually read to mean the same thing in both places. . . .

16

> Moreover, reading the term "prison conditions" to include claims of excessive force finds support in the purpose and legislative history of the Act. The Act was passed to reduce frivolous prisoner lawsuits and to reduce the intervention of federal courts into the management of the nation's prison systems. A broad exhaustion requirement that includes excessive force claims effectuates this purpose and maximizes the benefits of requiring prisoners to use prison grievance procedures before coming to federal court. Prisons need to know about and address claims of excessive force as they would any other claim concerning prison life so that steps may be taken to stop problems immediately if they exist.

196 F.3d at 643-644 (footnote omitted).

The U. S. Supreme Court has also held that "§ 1997e(a)'s exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences." *See Porter v. Nussle*, 534 U.S. 516, 520, 122 S.Ct. 983, 986 (2002). As the *Porter* Court stated:

> Beyond doubt, Congress enacted § 1997e(a) to reduce the quantity and improve the quality of prisoner suits; to this purpose, Congress afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. . . . In other instances, the internal review might "filter out some frivolous claims." . . . And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy.
>
> . . .
>
> For the reasons stated, we hold that the PLRAs exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.

122 S.Ct. at 988, 992 (citations omitted, emphasis added).

**D.    The Case at Bar**

As an initial matter, under the reasoning of *Porter* and *Freeman*, Plaintiff's claims in the case at bar fall within the meaning of the term "prison conditions" as used in § 1997e(a). He is, therefore, required to exhaust his administrative remedies as set forth in the PLRA.

As recounted above, Plaintiff alleges generally that he was denied medical treatment by TDOC and other medical providers. Docket No. 1. With respect to Plaintiff's specific allegations against Defendants Higgs and Lane (both of whom are MCCX physicians), Plaintiff's sole allegation is: "On August 8, 2017, Dr. Wiley advised TDOC medical personnel (including Edmund Lane and/or Ronald Higgs) that Plaintiff was suffering from 'chronic severe headaches,' and that he needed to receive 'neurological and psychological intervention' and that need is urgent: 'Consult urgent.'" Docket No. 1, ¶ 17, *citing* Ex.1.

An examination of Plaintiff's Exhibit 1 reveals that it is not a note from Dr. Wiley as Plaintiff states, but rather, is an order and note issued by Defendant Lane stating: "Neurological evaluation chronic severe headaches per advice of Dr. Wiley. This is for neurological and psychological intervention @ special needs – consult urgent, Edmund Lane MD MCCX." Docket No. 1, p. 12. Accordingly, Plaintiff has failed to levy any specific allegations against Defendant Higgs, and Plaintiff's own Exhibit establishes that Defendant Lane ordered that Plaintiff receive a consultation on August 8, 2017. *See* Docket No. 1, Ex. 1. Thus, Plaintiff's own Exhibit demonstrates that Defendant Lane was providing the recommended care. *Id.* Plaintiff's own Exhibit further demonstrates that on or about August 21, 2017, Plaintiff was transferred out of MCCX and no longer under the care of those medical providers. *Id.*

Plaintiff fails to allege, much less demonstrate, that either Defendant Higgs or Defendant Lane personally condoned, encouraged, or participated in the conduct that allegedly violated his

rights. *Birrell*, 867 F.2d at 959; *Bellamy,* 729 F.2d at 421. Plaintiff has failed to establish the requisite "causal connection between the misconduct complained of and the official sued" (*Dunn*, 697 F.2d at128), such that he cannot sustain his § 1983 claim against Defendant Higgs or Defendant Lane.

Moreover, Plaintiff's Complaint fails to state a claim under TCA § 29-26-121 or 122 because Plaintiff did not provide the requisite notice, nor did he attach the required notice documents to his pleadings or provide a certificate of good faith as required.

Defendants Higgs and Lane request an award of attorney's fees pursuant to U. S. C. § 1988. Under § 1988 the Court may award attorney's fees to a prevailing Defendant. However, "[a]n award of attorney fees against a losing Plaintiff in a civil rights action is an extreme sanction and must be limited to truly egregious cases of misconduct. . . . A prevailing Defendant should only recover upon a finding of the district court that the Plaintiff's action was frivolous, unreasonable, or without foundation, and even though not brought in subjective bad faith." *Tahfs v. Proctor*, 316 F. 3d 584, 596 (6th Cir. 2003)(citation omitted). "The fact that a Plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees." *Hughes v. Rowe*, 449 U. S. 5, 14 (1980).

Apart from citing the statute, the Defendants offer no argument as to why an award of attorney's fees in this case would be appropriate. While they argue dismissal is an appropriate remedy, neither Defendant makes an argument that Plaintiff's claims are frivolous or otherwise justifies their position that attorney fees are warranted. Although the Court finds that Plaintiff did not adequately plead his claims, the Court does not find that the Plaintiff's claims are so frivolous as to warrant sanctions under § 1988. Thus, the Court is not inclined to recommend Defendants

have met the standard for an award of attorney fees especially based upon the record before the Court at this time.

## IV. CONCLUSION

For the reasons discussed above, the undersigned recommends that Defendant Higgs' Motion to Dismiss (Docket No. 26) be GRANTED. The undersigned further recommends that Defendant Lane's Motion to Dismiss (Docket No. 28) likewise be GRANTED. With regard to Defendants Higgs and Lane's request for attorneys' fees, the undersigned recommends that said request is DENIED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**